Filed 10/29/20  In re O.C. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re O.C. et al., Persons Coming Under the Juvenile Court Law. | C091677 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.C.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JVSQ-18-220, JVSQ-18-221) |

D.C., mother of the minors (mother), appeals from the juvenile court's orders denying her petition to modify previous orders and terminating her parental rights over O.C. and I.C.-M. (minors).[1]  (Welf. & Inst. Code, §§ 366.26, 388, 395.)[2]  Mother

---

[1]    The minors' respective fathers, E.C. and C.M., never appeared in the dependency proceedings and are not parties to this appeal.  They will not be discussed unless relevant to the issues raised by mother.

[2]    Undesignated statutory references are to the Welfare and Institutions Code.

1

contends the juvenile court erred in denying her section 388 petition. She further contends the court erred in finding the Indian Child Welfare Act of 1978 (25 U.S.C. § 1912 et seq. (ICWA)) did not apply. Respondent Yolo County Health and Human Services Agency (Agency) concedes the ICWA issue. We will affirm in part and reverse and remand for limited ICWA proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

On April 19, 2018, the Agency filed a dependency petition on behalf of O.C. (then 14 years old) and his brother I.C.-M. (then four years old) pursuant to section 300, subdivision (b), alleging failure to protect due to mother's methamphetamine abuse and mental health issues. Mother reportedly had an extensive child welfare history related to O.C. and her adult son, L.C., which included the provision of family maintenance services between 2008 and 2009, November 2011 and June 2012, and January 2013 and July 2013, and reunification services for nearly three months in 2011, and seven months in 2012 to 2013.

At the detention hearings on April 20, 2020, and April 24, 2018, the court ordered the minors detained with supervised visits for mother, and further ordered reunification services for mother to include substance abuse testing, substance abuse treatment, parenting education, and mental health counseling.

The Agency's May 2018 jurisdiction/disposition report stated mother disclosed having relapsed on methamphetamine sometime in April 2018. As of May 17, 2018, mother was at an inpatient drug treatment facility. She reported that she began using methamphetamine at the age of 19. Following an attempted suicide as a teenager, she participated in some mental health treatment and therapy. She was diagnosed with posttraumatic stress disorder, depression, and bipolar disorder, for which she was prescribed medication that she chose not to take.

The court sustained the allegations in the petition, declared the minors dependents of the court, and ordered them removed from mother's custody.

In November 2018, the Agency reported that mother participated in services with some regularity.  However, the Agency had some concerns related to mother's activities while away from the transitional housing program, her difficulty with accepting criticism from program staff, the fact that mother was asked to leave the transitional housing program for threatening her roommate and breaching the confidentiality of fellow residents, and her discharge from the inpatient substance abuse treatment program due to breaching confidentiality.  However, mother was reportedly testing negative and was engaged in individual counseling.  Mother participated regularly in supervised visitation but had not transitioned to unsupervised visitation due to improper behavior during visits, including making and taking calls and texts rather than interacting with the minors, interacting with only one minor while giving the other minor her phone, and engaging in inappropriate topics of conversation with the minors.  Mother also disparaged the rules of the minors' foster home and told the minors they could watch movies or play games rated beyond their age limitations.  Mother was observed to be under the influence at an August 3, 2018 visit.  She arrived at another visit accompanied by two people not previously approved.  It also was reported that when the minors' half-brother L.C. and his girlfriend attended visits, they were inappropriate with the minors and mother did not make any effort to employ good parenting practices to encourage positive interactions.

The court continued mother's reunification services at the six-month review hearing on November 6, 2018.

The Agency's May 2019 status review report recommended that mother receive continued services.  Mother was accepted into subsidized housing and continued to test negative for all substances.  She continued to engage in mental health services and 12-step recovery and was fairly consistent in her visits.  She regularly attended AA/NA meetings but stated she was unable to participate in parenting classes until the minors were returned to her care.  When instructed to participate in general parenting classes in

the interim while the minors were still detained, mother declined, stating she already completed parenting education in her prior case.

The eldest of the two minors, O.C., told the social worker that while he felt positive about his relationship with mother, he did not want to reunify with her. O.C. had been placed in foster care three times and experienced multiple placement disruptions. He reported he found safety and stability in his foster home and had worked hard to build positive relationships in his community with the support of his teachers, school faculty, coaches, foster parents, therapists, and other adults in his life, and felt for the first time that he had the opportunity to achieve goals and build a future for himself. I.C.-M., on the other hand, was reportedly eager to visit mother and wanted to return to her care. His teacher reported some behavioral concerns, particularly after visits with mother.

The Agency had ongoing concerns about mother's protective capacity and was reportedly exploring community-based services and more intensive mental health services to increase mother's ability to identify unsafe individuals. Those concerns were due in part to mother's failure to utilize referred services or identify domestic violence services as necessary despite having reported in October 2018 that the man she lived with had become sexually aggressive toward her. Similarly, she relied on D., a friend from AA/NA who was a registered sex offender, to transport her to her visits with the minors. She also continued to store her massage table at the home of her uncle who in the past physically abused the minors and physically and sexually abused mother. Mother declined to participate in domestic violence classes stating she already completed those classes in her prior case and did not feel she would benefit from additional services to address her domestic violence history. The Agency also had continuing concerns about mother's inappropriate boundaries during visits, noting she tended to make promises to the minors which she was not able to keep.

4

At the 12-month review hearing on May 14, 2019, the court continued mother's reunification services and made visitation orders. A domestic violence survivor's program was added to mother's case plan.

The October 2019 status review report recommended the court terminate mother's reunification services and set the matter for a section 366.26 hearing. While the minors had been placed together in the same foster home since the inception of the case, I.C.-M. was moved to a separate foster home where he was adjusting well. Following several incidents involving inappropriate boundaries and sexual contact between O.C. and a female youth in his foster home, O.C. was eventually placed in the new foster home with his younger brother.

While mother continued to drug test negative, and participated in a recovery support group through church and domestic violence classes at Empower Yolo, the Agency's concerns persisted about her ability to protect herself and the minors from harmful relationships or to establish healthy boundaries. For example, the visitation monitor reported that mother had a boyfriend, S., who was incarcerated for shooting somebody and who was previously incarcerated for domestic violence against his ex-girlfriend. Mother gave O.C. a letter from S., who mother claimed was "in jail for something he didn't do," in which S. referred to himself as "Dad" and referred to O.C. as "son" and instructed O.C. to tell the social worker and the court that he wanted to go home with mother. When confronted about giving O.C. the letter, mother stated it was okay because S. was "like family." It also was noted that mother had been using other tactics to pressure O.C. to agree to return home.

Other concerning behavior included a report that in July 2019, mother was a collateral on a referral investigated by the Agency in which mother babysat an infant while the infant's mother, another resident in mother's apartment complex, was using methamphetamine. In August 2019, during a home visit, mother showed the social worker a video of I.C.-M. dancing to a song with sexually explicit and profane lyrics.

5

During the visit, mother told the social worker she had to call the police on one of her neighbors, M., who was present during a previous home visit, because the neighbor refused to leave mother's apartment. Mother also told the social worker she had broken up with S. but was open to the possibility of getting back together with him if he completed his substance abuse treatment program after being released from prison. During another visit in August 2019, mother appeared distraught, telling the social worker she was supposed to visit someone in jail but "it didn't go through" and she had to fill out "another Form 22" for the visit to be approved and rent a car to drive to Los Angeles. The social worker later learned that S. was incarcerated in Los Angeles and obtained information that mother had been having noncontact visits with S. and that her visits were previously suspended on November 24, 2018, after mother was caught giving S. marijuana in the visiting room of a previous correctional facility. It was also confirmed that mother visited other inmates in the Los Angeles prison.

The social worker reported that she received a text from M. on September 11, 2019, claiming mother had been "sneaking drugs into prison and she had drugs in her house while [the minors] were over in the past." The social worker received another text from M. five days later stating that mother "texted me yesterday and asked me to come over and help her sell some drugs." The social worker requested and received a screenshot of the alleged text from mother to M. and concluded that while the information provided by M. was not credible, it demonstrated that mother continued to surround herself with unsafe and untrustworthy individuals.

The Agency noted that this was mother's fourth child welfare case and O.C.'s third time in out-of-home care. Mother already had received 18 months of services and, while she had participated in services and appeared to have maintained her sobriety, she had not gained any insight into how to keep the minors safe and she continued to surround herself with unsafe individuals. The Agency was also concerned about mother's manipulative behavior toward O.C., noting mother lacked insight into why O.C.

6

might not want to return home.  The Agency concluded that despite all the services provided to mother both in the current proceeding and in prior dependency cases, mother was still not able to safely parent the minors and thus it was in the minors' best interest to terminate mother's reunification services and set the matter for a section 366.26 hearing.

*Termination of services*

At the contested 18-month hearing on October 17, 2019, mother testified that she had tested clean for quite some time, she participated in individual counseling, a domestic violence support group, and a recovery support group through church, and she had learned a lot from the various programs in which she participated.  She denied the minors were removed from her because her living situation with her uncle was "a domestic violence situation," but stated that when she lived with her uncle he was "really mean to me and my kids."  She stated she had to stay with her uncle the last two weeks of each month because she was homeless and had no more money for hotel rooms.  She testified she had been in her current apartment since November 2018.

Mother testified she learned coping skills such as looking for red flags, "like if I'm walking down the street and somebody yells, you know, and don't know my name, I'm going to continue walking, you know, because if you're going to yell at somebody, that's a red flag, right?"  She also stated, "But I'm learning different flags that I missed in domestic violence classes.  That's why I continue going."

When asked about S., mother testified he was a good friend who she was dating but that she had not seen him for nine months and had not spoken with him since July.  She testified she met S. through her ex-husband and had known him since she was 19 years old.  She further testified she had been talking to him on the phone daily for about eight months but she stopped talking to him in July because he was still married and she did not "feel right being around him or talking to him."  She had planned to go see him in August but did not, stating, "I was down on myself because that would have been a bad decision if I would have went to see him.  My kids mean more to me than some

7

relationship like that, you know. I don't want to be around somebody like that." She again claimed he was incarcerated for something he did not do.

When asked about the letter S. sent to O.C., mother testified that O.C. had not spoken to S., but since S. claimed mother "as his wife, he had claimed [mother's] kids as his kids." Mother admitted she should not have given the letter to O.C., explaining she would never leave the minors with S. and that she "can't trust him." She also admitted she told the visitation supervisor the letter was "between a father and a son," but denied reading the letter before giving it to O.C. She admitted S. was pressuring O.C. to return home but denied doing so herself. She also denied passing contraband to S. in prison, being in a relationship with him currently, or wanting to get back together with him in the future, and stated she never planned to allow the minors to see him. She admitted having been in at least two prior domestic violence relationships.

Mother testified the domestic violence classes really helped her and taught her to stop and think about her decisions. She learned in individual counseling to set boundaries. She testified she planned to start parenting classes but could not do so until I.C.-M. was returned to her care.

Following argument from the parties, the court noted mother's extensive child welfare history, her past relationships with violent or dangerous men, and her "poor parenting and unsafe parenting." With regard to S., the court stated, "It shocks the conscious [*sic*] that a mother would first develop a relationship with a man in prison under those circumstances and effectively get engaged in some regards, I mean, in allowing the man to act like a father to a child he's never met, a child that's been in the CPS history and system for an extended period of time. I mean, there's not a reasonable person in our community that would conclude that that was anywhere remotely close to being safe parenting. And it really shocks the conscious [*sic*]." The court continued, "So sometimes a single incident of poor judgment can be viewed as isolated and not likely to reoccur. In this case, it's so severe and it's consistent with a lifetime of unsafe parenting

that it—it's a factor the Court relies upon heavily. [¶] There's also additional facts in the record that weren't highlighted in testimony, but they're clearly in the reports about poor decisions the mother's made regarding neighborhood conduct and neighbors and people coming and going from her house, and that's all set forth . . . in the record." The court commended mother for remaining clean and sober since April 2018 and for participating in good faith in her church program and counseling, noting she "showed a lot of insight" in some of her testimony. However, the court also noted that having insight "does not trump the actual conduct," adding it was "terrifying that [mother] would develop a relationship with a man named [S.] and then give an unread letter to a young boy suggesting a parenting relationship. I mean—and then to leverage that letter into trying to guilt the boy into return, wow. It shocks the conscious [*sic*]. I said that three times now. I can't emphasize it enough." The court found that despite mother's engagement in services and her sobriety and the fact that "she is a loving mother to her two children," it would nonetheless be detrimental to return the minors to mother, terminated mother's reunification services, and set the matter for a contested section 366.26 hearing.

*Mother's section 388 petition*

On January 22, 2020, mother filed a petition pursuant to section 388 requesting that the court either place both minors with her or place I.C.-M. with her and provide her with family maintenance or reunification services. Mother argued that since termination of her services, she enrolled herself in parenting classes, completed over 27 domestic violence support group sessions and continued to participate in weekly sessions, was an active participant in her housing community, stopped all communication with S. and had neither written nor visited him, and continued to maintain her sobriety and established a strong support system. She argued the requested change was in the minors' best interest because the minors "deserve to preserve the family relationship between them and their mother. She raised them until their removal, in which time they have developed a strong bond with her. Mother has maintained that bond through consistent and appropriate

9

visitation, including post termination of services." She added that both minors were old enough to always remember who their mother is and "placing them in her care will preserves [*sic*] ongoing relationship they have with her." The court set the matter for a contested hearing.

*Section 366.26 report*

The February 2020 section 366.26 report stated mother continued regular visits with the minors. However, despite being instructed not to give a cell phone to I.C.-M., mother did so anyway, giving the minor access to social media and the Internet. The minors had reportedly made a "very positive adjustment" being placed together in their caregivers' home. They referred to their caregivers as their parents and were content to remain with them while still maintaining contact with mother. O.C. did not wish to return to mother's care and wished to stay with his caretakers permanently under a plan of legal guardianship. I.C.-M. stated he was glad to be in a "forever family" and "doesn't want to change families again." The adoption assessment concluded I.C.-M. was adoptable.

*Section 388 and section 366.26 hearing*

On March 2, 2020, the court heard testimony from mother in support of her section 388 petition. Mother testified regarding her continued participation in services, including parenting and domestic violence classes, her community service work, and her volunteer work at her apartment complex. She testified she was no longer talking to her ex-boyfriend S. and had not seen him since January 2019. She stated she was not currently in, nor did she want to be in, a relationship with anyone. Mother further testified that she would identify a safe person as someone who is not abusive and who would not force her to do anything she did not want to do. She stated she had 24-hour support from the management at her apartment complex, the bishop at her church, other members of her church, her sponsor, and her aunt. Mother also testified about her

visitation with the minors and her plans for them if either or both of them were returned to her.

The court denied mother's petition, concluding as follows: "The effort that you made is too little too late. Even if I could find there's been some change in circumstance because you have decided that you're going to try to do some of these things that have been asked of you in the past, there is no way that I could say that to change the order about services would be in the best interest of the children. [¶] It absolutely would not be in the best interest of the children, and I can make that finding by clear and convincing evidence that it is not in the best interest of the children."

Regarding O.C., the court found termination of parental rights would be detrimental given the minor's clear statement of his desire for a legal guardianship under his current caretakers. The court ordered a permanent plan of guardianship, terminated dependency jurisdiction, and ordered continued visitation with mother. Regarding I.C.-M., the court found the minor likely to be adopted and terminated parental rights.

## DISCUSSION

### I

### *Denial of Section 388 Petition*

Mother contends the juvenile court abused its discretion when it denied her section 388 petition requesting that the court modify its previous order and place I.C.-M. in her custody and care. The claim lacks merit.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's

11

request. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see *In re Daijah T.* (2000) 83 Cal.App.4th 666, 671-672.)

The change of circumstances or new evidence "must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485; see *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1451.) When reunification services have been terminated and a section 366.26 hearing has already been set, a court assessing the child's best interests must recognize the focus of the case has shifted from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his or her "hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The petitioner has the burden of proof by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(D).) In assessing the petition, the juvenile court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

We review the denial of a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

Here, the court terminated mother's reunification services in October 2019. Mother filed her section 388 petition three months later in January 2020. In that three-month period, mother argues, she enrolled herself in parenting classes and completed numerous domestic violence support group sessions, maintained her sobriety, established a support system, and stopped all communication with S. The Agency argues, and we

12

agree, that the chief issue in the case was not simply mother's engagement in services or her sobriety, but whether mother could safely parent the minors, and key to that issue was whether mother had the ability to identify unsafe individuals. In that regard, the record supports the court's finding that mother failed to demonstrate her circumstances had changed and that placement of the minors with her with continued services was in the minors' best interests.

When the court terminated mother's reunification services in October 2019, the court commended mother on her participation in services and her sobriety but found that her conduct nonetheless demonstrated a "lifetime of unsafe parenting." Mother's pattern of unsafe parenting was made most apparent by the fact that she developed a relationship with S., a man who was incarcerated for a violent crime and had previously been incarcerated for domestic violence. Mother then allowed S. to communicate with O.C. via a letter mother claimed not to have read in which S. referred to himself as "Dad" and to O.C. as "son" despite that O.C. had never met S. Among other things, the letter attempted to pressure O.C. into returning home. Mother's propensity to gravitate toward unsafe individuals also was demonstrated by a report that mother was involved collaterally in a referral being investigated by the Agency in which mother babysat another resident's infant while that resident used methamphetamine, and by mother's own report she had to call the police on M., a friend who she allowed to stay in her apartment but who then refused to leave. Mother later testified M.'s boyfriend physically assaulted mother prompting mother to obtain a restraining order against him. Additionally, M. reportedly accused mother of soliciting M. to help sell drugs, an accusation the social worker did not find credible, but which further demonstrated mother's continued pattern of surrounding herself with unsafe individuals.

In October 2019, mother testified she had been talking to S. every day on the phone for approximately eight months until she stopped talking to him in July 2019. She explained she stopped communicating with S. because he was still married and she did

not feel right about talking to him or being around him. However, mother never mentioned S.'s violent past which included domestic violence; instead, she reiterated her belief that he was incarcerated for something he did not do. She also admitted she had planned to rent a car and drive to Los Angeles to visit S. in prison in August 2019, one month after she claimed to have stopped communicating with him.

At the March 2020 hearing on mother's section 388 petition, mother testified she was no longer talking to S., she had not seen him since January 2019, and she was not in a relationship with anyone. She identified a safe person as someone who was not abusive and would not force her to do something she did not want to do. However, her plan to keep herself and her children safe seemed to be to avoid people altogether and to not have her kids around people because "you never know how a person is." Mother also testified she started a parenting class and she continued to engage in domestic violence support group sessions she had started in August 2019. However, she admitted she did not start the parenting class until December 2019 after the court terminated her services, that she had declined to participate in parenting classes since the inception of the proceedings, claiming she could not participate in hands-on parenting until I.C.-M. was returned to her care, and that she did not feel the need to participate in general parenting classes because she had already done so in her prior dependency case. She also admitted she declined to participate in domestic violence classes earlier in the proceedings because she had already completed domestic violence classes in her prior dependency case. As the juvenile court noted, while mother's engagement in services and continued sobriety was commendable, the evidence mother presented to demonstrate a change in her history of unsafe parenting was, at best, weak.

Mother argues she demonstrated changed circumstances through the documentation attached to her section 388 petition, her ability to maintain her sobriety, and her testimony about the insights and knowledge she gained and the techniques she was able to implement as a result of her participation in services. In that regard, she

14

points to her testimony that the parenting classes taught her "the morals, the discipline, the positive reinforcements, behaviors changes . . . and sex education" to teach kids "to look out for on STDs," and she had been able to implement "positive disciplining and positive reinforcements."  Mother also argues she demonstrated changed circumstances through her decision to stop all communication and contact with S., resist relationships with men, and avoid having any man assist her with transportation to and from visits, as well as the fact that she had a list of people who were willing to provide support to her and her children at any time.

Again, while mother's sobriety and her progress in various aspects of her case plan was commendable, the parenting techniques about which she testified focused on her discipline of and response to the minors' behaviors, not on strategies or techniques for keeping the minors safe.  And while mother was no longer communicating with S. and was steering clear of relationships and offers from men to transport her to visits, there was a dearth of evidence either from mother or any other source to demonstrate mother's "lifetime of unsafe parenting" was changed rather than changing.  In short, neither her testimony nor the documentation attached to her petition demonstrated that mother yet had the ability or the insight to stop her pattern of unsafe parenting.

Mother argues she also provided sufficient evidence that the requested change was in the minors' best interests.  In doing so, she urges us to reverse the course we took in *J.C., supra*, 226 Cal.App.4th 503, where we declined to apply the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 because it failed to give full consideration to the shift in focus from family reunification to promoting the minors' needs for permanence and stability.  (*J.C.*, at p. 527.)  We again decline to do so.  Mother had a significant amount of family maintenance and reunification services in her prior dependency cases, including parenting and domestic violence classes.  Despite having received those services, mother again came to the attention of the Agency due to her drug abuse and unsafe parenting.  She was provided 18 more months of services in this matter but

15

resisted engaging in parenting classes until several months before the hearing on her petition. Given the seriousness of mother's history of unsafe parenting, and the fact that the minors were comfortable and settled with their caregivers, who they referred to as their parents and with whom they wanted to remain, there was sufficient evidence to support the court's finding that return of one or both of the minors to mother or providing mother with more services was not in the minors' bests interests.

The juvenile court did not abuse its discretion in denying mother's section 388 petition.

## II

### *The ICWA*

Mother contends the juvenile court and the Agency failed to adequately make inquiries under the ICWA despite that there was reason to believe the minors were Indian children. The Agency concedes the issue and agrees that the matter must be reversed and remanded for further ICWA proceedings. As we shall explain, the Agency's concession is proper.

### *Background*

Mother was interviewed on April 17, 2018, and stated she had Indian ancestry. She confirmed possible Indian heritage in her parental notification of Indian status filed the following week.

The court's April 24, 2018 detention order noted there was a reason to believe the minors might be of Indian ancestry.

On May 11, 2018, the Agency sent a notice of child custody proceeding for Indian child (form ICWA-030) for each minor to the Bureau of Indian Affairs (BIA), the Secretary of the Interior, the Blackfeet Tribe, the Cherokee Nation, the Eastern Band of Cherokee Indians, the Santa Ynez Band of Mission Indians, the Tejon Indian Tribe, and the United Keetoowah Band of Cherokee. The notices contained the minors' and mother's names, their birth dates, places of birth, mother's address, and possible tribes, as

16

well as the name of each minor's respective father, and minimal information regarding the maternal grandparents.

The Agency's May 2018 jurisdiction/disposition report stated mother claimed she had Cherokee and Chumash ancestry but was not an enrolled member in either tribe.

On May 16, 2018, the Tejon Indian Tribe sent a response to the ICWA notices and stated neither minor was a member and that eligibility for membership in the tribe was unknown as to both minors.

In the November 2018 status review report filed on October 26, 2018, the Agency reported that the ICWA notices were sent to six tribes "per the report of the mother." As of August 2018, the Agency had received responses from two more tribes confirming the minors were neither members of nor eligible for membership in the respective tribe. Sixty days had elapsed without receiving responses from the remaining three tribes. As such, the Agency requested that the court find the ICWA did not apply to either minor.

The May 2019 and October 2019 status review reports and the February 2020 section 366.26 report stated the court previously found the minors were not Indian children. The February 2020 report also noted the whereabouts of I.C.-M.'s father, C.M., were still unknown, but O.C.'s father, E.C., had been located and personally served with notice of the section 366.26 hearing. The court's verbal order and its written minute order following the 12-month review hearing confirmed the ICWA "does not apply."

*Law*

"The juvenile court and social services agencies have an affirmative duty to inquire at the outset of the proceedings whether a child who is subject to the proceedings is, or may be, an Indian child. [Citation.]" (*In re K.M.* (2009) 172 Cal.App.4th 115, 118-119.) When the juvenile court knows or has reason to know that a child involved in a dependency proceeding is an Indian child, the ICWA requires that notice of the proceedings be given to any federally recognized Indian tribe of which the child might be a member or eligible for membership. (25 U.S.C. §§ 1903(8), 1912(a); *In re Robert A.*

17

(2007) 147 Cal.App.4th 982, 988-989.) "At that point, the social worker is required, as soon as practicable, to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. [Citations.]" (*In re Michael V.* (2016) 3 Cal.App.5th 225, 233; see Cal. Rules of Court, rule 5.481(a)(4)(A).)

The ICWA notice must include all of the following information, if known: the child's name, birthplace, and birth date; the name of the tribe in which the child is enrolled or may be eligible for membership; names and addresses (including former addresses) of the child's parents, grandparents, and great-grandparents, and other identifying information; and a copy of the dependency petition. (§ 224.3, subd. (a)(5)(A)–(H); *In re D.W.* (2011) 193 Cal.App.4th 413, 417; *In re Mary G.* (2007) 151 Cal.App.4th 184, 209.)

While the Agency sent notices to six tribes that included relevant information about mother and the two fathers, the notices contained very little or no information about the maternal and paternal grandparents or great-grandparents. Further, there was no evidence the Agency made any effort to obtain additional information from mother or from E.C. once he was located. Section 224.2, subdivision (a) imposes "an affirmative and continuing duty to inquire" whether a child is or may be an Indian child. "It is essential to provide the Indian tribe with all available information about the child's ancestors, especially the one with the alleged Indian heritage. [Citation.] Notice to the tribe must include available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data. [Citation.]" (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703; accord, *In re Louis S.* (2004) 117 Cal.App.4th 622, 631 ["The Agency must provide all known information to the tribe, particularly that of the person with the alleged Indian heritage"]; *In re J.M.* (2012) 206 Cal.App.4th 375, 381.)

18

Here, as mother argues and the Agency properly concedes, the ICWA notices failed to include known or readily ascertainable information, including the names of the paternal grandparents and great-grandparents and additional information about the maternal grandparents and great-grandparents.

The Agency's duty of ICWA inquiry extends to the minor's extended family, if known.  (§ 224.2, subd. (b); Cal. Rules of Court, rule 5.481(a)(4).)  Here, information regarding the minors' extended family was known.  Whether the Agency contacted the grandparents or great-grandparents or attempted to speak with them is unknown given the absence of any mention of such efforts in the record.  That problem is compounded by the fact that the court never inquired about what efforts the Agency made to obtain information from mother's or either father's family members.  "[O]nce there is sufficient information to believe that the children might be Indian children within the meaning of [the] ICWA and the California statutes, 'responsibility for compliance' with those statutes 'falls squarely and affirmatively' on *both* the social services agency and the court.  [Citation.]  Accordingly, the court has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.)  While the affirmative and continuing duty of inquiry does not require the social services agency to conduct a comprehensive investigation into the minor's Indian status or to "cast about for Indian connections" (*In re C.Y.* (2012) 208 Cal.App.4th 34, 42; *id.* at p. 39; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1161), the agency must include in its reports a discussion of what efforts it undertook to locate and interview family members who might have pertinent information and, "[i]n the absence of an appellate record affirmatively showing the court's and the agency's efforts to comply with [the] ICWA's inquiry and notice requirements, we will not, as a general rule, conclude that substantial evidence supports the court's finding that proper and adequate ICWA notices were given or that [the] ICWA did not apply." (*In re N.G.* (2018) 27 Cal.App.5th 474, 484; accord, *K.R., supra*,

20 Cal.App.5th at p. 709.)  Here, the Agency failed its duty of inquiry.  Therefore, the notices sent by the Agency were insufficient for purposes of the ICWA.

"[E]rrors in an ICWA notice are subject to review under a harmless error analysis."  (*In re Brandon T*. (2008) 164 Cal.App.4th 1400, 1415.)  If we conclude the juvenile court did not comply with the ICWA provisions, we "reverse only if the error is prejudicial."  (*In re A.L.* (2015) 243 Cal.App.4th 628, 639.)  Error is not presumed.  It is mother's obligation to present a record that affirmatively demonstrates error.  (*In re D.W., supra*, 193 Cal.App.4th at pp. 417-418.)  Mother has done so here.  In the absence of evidence of the Agency's efforts to fulfill its continuing duty of inquiry, we cannot say the failure of ICWA compliance was harmless.  Therefore, we must remand for limited ICWA proceedings.

## DISPOSITION

The juvenile court's orders terminating parental rights are reversed and the matter remanded to the juvenile court for limited proceedings to determine compliance under the ICWA.  If, at the conclusion of those proceedings, no tribe indicates either one of the minors is an Indian child within the meaning of the ICWA, then the juvenile court shall reinstate the orders terminating parental rights.  In all other respects, the orders of the juvenile court are affirmed.

                                                   KRAUSE           , J.

We concur:

     BLEASE         , Acting P. J.

     HOCH          , J.